[Cite as *State v. Fairman*, 2011-Ohio-6489.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO               :

                       :      Appellate Case No. 24299

    Plaintiff-Appellee    :

                       :      Trial Court Case No. 2010-CR-1160

v.                     :

                       :

JAY T. FAIRMAN         :      (Criminal Appeal from

                     :       Common Pleas Court)

    Defendant-Appellant    :

                     :

. . . . . . . . . . .

## O P I N I O N

Rendered on the 16th day of December, 2011.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by R. LYNN NOTHSTINE, Atty. Reg. #0061560, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. #0074057, 120 West Second Street, Suite 400, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, J.

{¶ 1}   Defendant-appellant Jay Fairman appeals from his conviction and sentence for one count of Felonious Assault with a firearm specification and one count of Having Weapons Under Disability.   Fairman contends that he was denied his right to compulsory process when

the trial court refused to issue a material witness warrant for one of his witnesses and that the trial court abused its discretion in denying his motion for a continuance in order to secure that witness's testimony. Fairman argues that his convictions are against the manifest weight of the evidence and that they are not supported by sufficient evidence. He also claims that he was denied the effective assistance of trial counsel. Finally, Fairman maintains that his sentence is contrary to law and that the trial court erred in imposing court costs.

{¶ 2} We conclude that Fairman was not denied his right to compulsory process, but under the particular circumstances of this case, the trial court did go beyond the limits of its discretion in denying his motion for a one-day continuance. We conclude that Fairman's convictions are supported by sufficient evidence and that they are not against the manifest weight of the evidence. We conclude that Fairman was not denied the effective assistance of trial counsel. We conclude that Fairman's conviction and sentence is contrary to law in that his Felonious Assault and Having Weapons Under Disability convictions should have merged as allied offenses of similar import. We also conclude that the trial court erred in ordering Fairman to pay court costs in the termination entry without first having addressed this issue during the sentencing hearing. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.

I

{¶ 3} Late one evening in April 2010, Zebonia English was driving in her van with Davares Pruitt in the front passenger seat and an intoxicated Fairman in the back. English made a stop at her home. She briefly went inside the house, while the two men waited for her in the van.

{¶ 4}  Tremayne Arnold, who was at a barbeque at the home of the Ziles, a couple of houses down, was going to get a ride from English.  When English opened the back door of her van,  Fairman saw Arnold.  Fairman began yelling at Arnold, insulting him and accusing him of having murdered Fairman's nephew.  Arnold denied having killed anyone.  English decided to take Fairman home and then return for Arnold.  However, when she tried to close the door, Fairman blocked it with his foot.  English and Channa Worsley, who had also been at the barbeque, tried to move Arnold away from the van, but they were unable to do so.

{¶ 5}  Arnold and Worsley heard Fairman asking Pruitt for a gun, but Arnold made no attempt to leave the scene.  At first Pruitt refused, but then Arnold saw Pruitt hand a gun to Fairman, who shot Arnold in the chest.  Witnesses agreed that Fairman and Pruitt left the scene together.  Arnold is the only witness who saw the shot being fired.  Minutes before the shooting, English's mother had seen a gun in the front passenger seat where Pruitt had been seated, but she did not see anyone holding or firing the gun.

{¶ 6}  After being shot, Arnold went behind English's house and made his way back to the Ziles' home, where he had been attending the barbeque.  English followed him.  Maggie and Melissa Zile and English took Arnold to the hospital, where  Arnold told the police that Fairman had shot him.  Arnold suffered from broken ribs and a collapsed lung.  He spent nearly two weeks in the hospital, during which time he underwent two surgeries.

{¶ 7}  Fairman was arrested several hours after the shooting.  He was indicted on one count of Felonious Assault with a firearm specification and one count of Having Weapons Under Disability, based upon a 2001 conviction for Robbery.  A jury found Fairman guilty of both charges and the specification.  The trial court ordered an aggregate sentence of fourteen

years in prison.   From his conviction and sentence, Fairman appeals.

II

{¶ 8}   Fairman's First Assignment of Error is as follows:

{¶ 9}   "THE TRIAL COURT DENIED MR. FAIRMAN HIS RIGHT TO COMPULSORY PROCESS."

{¶ 10} In his First Assignment of Error, Fairman contends that the trial court denied his right to compulsory process when the court refused to issue a material witness warrant for Pruitt after he failed to appear to testify on the second day of trial.   Both the Sixth Amendment to the United States Constitution, and Section 10, Article I of the Ohio Constitution, guarantee a criminal defendant the right to present witnesses on his behalf, and if necessary, allow the defendant to use the power of the court to compel the attendance of those witnesses.   *Washington v. Brown* (1967), 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (holding that the Sixth Amendment right to compel the attendance of witnesses is applicable to the states by virtue of the Fourteenth Amendment); *State v. Brown,* 64 Ohio St.3d 649, 1992-Ohio-19.

{¶ 11} According to Fairman, under Crim.R. 17(D), Pruitt was served with the subpoena for the second day of trial when the subpoena was left at his residence.   Fairman insists, therefore, that the trial court should have issued a material witness warrant for Pruitt after he failed to appear to testify on the second day of trial.   The State, on the other hand, points out that pursuant to R.C. 2317.21, a trial court may only issue a material witness warrant if the witness has been personally served with the subpoena; residential service is insufficient.

{¶ 12} Crim.R. 17(D) states in relevant part that "[s]ervice of a subpoena upon a person named therein shall be made by delivering a copy thereof to such person or by reading it to him in person or by leaving it at his usual place of residence * * * ." Revised Code 2317.21 states in relevant part that "[w]hen a witness * * * fails to obey a subpoena personally served, the court or officer, before whom his attendance is required, may issue to the sheriff or a constable of the county, a writ of attachment, commanding him to arrest and bring the person named in the writ before such court or officer at the time and place the writ fixes, to give his testimony and answer for the contempt."

{¶ 13} Although Crim.R. 17(G) allows for a finding of contempt against any witness who fails to obey a subpoena, no part of the rule provides for the issuance of a material witness warrant. Revised Code 2317.21 does permit this remedy, but the issuance of a warrant pursuant to that statute is permissible only when the witness has been "personally served." *State v. Kvasne,* 169 Ohio App.3d 167, 2006-Ohio-5235, ¶40.

{¶ 14} It is undisputed that Fairman served the subpoena upon Pruitt by residential service, not personal service. Because Fairman failed to personally serve Pruitt with the subpoena for the second day of trial, we conclude that the trial court did not err in refusing to issue a material witness warrant for Pruitt's arrest.

{¶ 15} Fairman's First Assignment of Error is overruled.

III

{¶ 16} Fairman's Second Assignment of Error is as follows:

{¶ 17} "THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING MR. FAIRMAN'S REQUEST FOR A ONE-DAY CONTINUANCE OF THE TRIAL."

{¶ 18} In his Second Assignment of Error, Fairman contends that the trial court acted outside its discretion by denying his request for a continuance after refusing to issue a material witness warrant for Pruitt. The decision of whether to grant a continuance is a matter entrusted to the sound discretion of the trial court. *State v. Unger* (1981), 67 Ohio St.2d 65, syllabus. Therefore, a reviewing court will not reverse a trial court's decision to deny a motion for a continuance absent an abuse of discretion. Id. at 67. "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite* (1964), 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, quoted in *State v. Unger*, supra, at 67 Ohio St.2d 67.

{¶ 19} Factors that a trial court must consider when ruling on a motion for a continuance include: (1) the length of the requested continuance; (2) any prior continuances; (3) the inconvenience to the litigants, witnesses, opposing counsel and the court; (4) reasons for the delay; (5) whether the defendant contributed to the delay; (6) and any other factors relevant to the unique facts of that case. *State v. Unger*, at 67-68; *State v. Landrum* (1990), 53 Ohio St.3d 107, 115.

{¶ 20} Both the State and the defense subpoenaed Pruitt for the first day of trial. Although Pruitt appeared that morning, he left after being told by the prosecutor that the State was not going to call him as a witness. Pruitt did not first check with either the defense or the court before he left. After the State finished its case, the court gave the defense 90 minutes in which to find Pruitt. The defense having been unable to find Pruitt in the allotted time, the

trial court allowed the defense until the following morning to produce Pruitt.

{¶ 21} Both the prosecution and the defense had telephone contact with Pruitt that evening. Pruitt indicated a willingness to testify, but explained that he had problems with getting to the courthouse because he was working in Cincinnati for the week. The defense issued a subpoena for the following day, which was left at Pruitt's residence, but Pruitt failed to appear to testify. When Fairman asked for an additional day to bring Pruitt into court, the trial court refused to grant a continuance.

{¶ 22} Before resting his case, Fairman proffered Pruitt's testimony as follows: Pruitt was in or near the front seat of the van at the time of the shooting, and he was the owner of the gun that was seen in that seat shortly before, presumably the gun that was used to shoot Arnold. Fairman proffered that Pruitt would have testified that the shot came from behind him, from outside the van in which Fairman was seated. The State proffered somewhat different testimony that it expected to elicit from Pruitt.

{¶ 23} The defense was not asking for a lengthy continuance, but only for one day in which it could secure Pruitt's attendance. Although the defense had not personally served Pruitt with a subpoena, its residentially served subpoena had succeeded in procuring Pruitt's attendance at court. The fact that Pruitt left without testifying was due to his unfortunate, but understandable, misunderstanding that when the State told him it did not need his testimony, that meant he could leave without testifying for either party. (There is no indication of any ulterior motive on the part of the State in releasing Pruitt; in fact, the prosecutor assisted in contacting Pruitt in an effort to get him to return to court.) It was reasonable to believe that given an additional day, Pruitt would have appeared in court, since the parties agree that

Pruitt, who had already appeared pursuant to subpoena, was not trying to avoid testifying. Additionally, the parties agreed that Pruitt's absence from the courthouse on the second day of trial was due to his lack of transportation rather than any effort to avoid testifying.

{¶ 24} This case went to trial just four months after the crimes were committed. The defense had asked for only two brief continuances during that time. Because of both the relative speed with which Fairman's case was moving through the trial court, and the short duration of the requested continuance, the inconvenience to the State, the court, and the jury would not have been great. There is no evidence of inconvenience to any of the other witnesses, all of whom had already testified. Nor is there evidence that the continuance was requested in order to delay the trial unreasonably; to the contrary, the brief continuance was requested to secure the testimony of a potentially important defense witness.

{¶ 25} Under the particular circumstances of this case, we conclude that the *Unger* factors weigh heavily in support of granting a brief continuance, and the trial court went beyond its discretion when it denied Fairman's request for a one-day continuance in order to secure Pruitt's potentially exculpatory testimony.

{¶ 26} Fairman's Second Assignment of Error is sustained.

IV

{¶ 27} Fairman's Third Assignment of Error is as follows:

{¶ 28} "MR. FAIRMAN WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL."

{¶ 29} Fairman's Fifth Assignment of Error is as follows:

{¶ 30} "MR. FAIRMAN WAS DENIED EFFECTIVE ASSISTANCE OF

COUNSEL."

{¶ 31} In his Third and Fifth Assignments of Error, Fairman claims that he was denied his right to the effective assistance of trial counsel. An attorney who is properly licensed in the State of Ohio is presumed to be competent; therefore, the burden of proving such a claim is on the defendant. *State v. Bays* (Jan. 30, 1998), Greene App. No. 95-CA118, citing *State v. Jackson* (1980), 64 Ohio St.2d 107, 111. In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance – i.e., that counsel's representation fell below an objective standard of reasonableness – and resulting prejudice. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136. For the following reasons, we conclude that Fairman fails to meet this burden.

{¶ 32} In his Third Assignment of Error, Fairman argues that his trial counsel was ineffective for failing to request a mistrial after the trial court denied his motion for a continuance. This argument is moot in view of our disposition of Fairman's Second Assignment of Error. And, in any event, any error in the trial court's denial of his motion for a continuance was preserved by Fairman's having made the motion, and having the motion be denied by the trial court. Counsel was not required to move for a mistrial to preserve error in this regard.

{¶ 33} Fairman insists in his Fifth Assignment of Error that his trial counsel was ineffective for failing to request a limiting instruction regarding the extent to which the jury could consider evidence of his prior Robbery conviction. Fairman assumes that without a limiting instruction, "it is likely that the jury misused the evidence."

{¶ 34} The court did instruct the jurors that Fairman had to be acquitted unless the State provided evidence to convince them beyond a reasonable doubt of each element of the offenses with which he was charged. A jury is presumed to follow the instructions provided to it by the trial court. See, e.g., *State v. Garner* (1995), 74 Ohio St.3d 49, 59.

{¶ 35} Furthermore, the jurors heard no facts about the prior Robbery conviction. There was no reason for them to assume that the crime involved a gun or that it resulted in physical harm to the victim. The State merely offered the fact of the conviction, which was necessary to prove the Having Weapons Under Disability charge. Moreover, at no time during either its opening statement or its closing argument did the prosecutor urge the jury to consider the evidence of Fairman's prior Robbery conviction for any other purpose than as proof his disability to support the Having Weapons Under Disability charge.

{¶ 36} Furthermore, trial counsel may have decided not to request a limiting instruction as a matter of legitimate trial strategy, since any limiting instruction may have had the effect of reminding the jury of Fairman's prior Robbery conviction, much as the classic instruction to not think about a white Polar bear usually (and in some studies invariably) fails of its purpose.

{¶ 37} Fairman's Fifth Assignment of Error is overruled. His Second Assignment of Error having been sustained, his Third Assignment of Error is overruled as moot.

V

{¶ 38} Fairman's Fourth Assignment of Error is as follows:

{¶ 39} "MR. FAIRMAN'S CONVICTIONS WERE AGAINST THE SUFFICIENCY AND WEIGHT OF THE EVIDENCE."

{¶ 40} In his Fourth Assignment of Error, Fairman contends that his convictions are not supported by sufficient evidence and that they are against the manifest weight of the evidence.

{¶ 41} A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."In contrast, when reviewing a judgment under a manifest weight standard of review "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." *Thompkins,* supra, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175.

{¶ 42} Fairman was convicted of Felonious Assault in violation of R.C.

2903.11(A)(2), with a R.C. 2941.145 firearm specification. Revised Code 2903.11(A)(2) states in relevant part: "No person shall knowingly * * * cause or attempt to cause serious physical harm to another * * * by means of a deadly weapon or dangerous ordnance." The firearm specification imposes a mandatory three-year prison term if "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." Fairman was also convicted of Having Weapons Under Disability in violation of R.C. 2923.13(A)(2), which states, "* * * no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment or has been convicted of any felony offense of violence * * *."

{¶ 43} Fairman insists that the State failed to prove "that he had, or used a gun." His argument centers on the credibility of the witnesses. However, the credibility of witnesses and the weight to be given to their testimony are primarily matters for the trier of fact to resolve. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231. The jury heard the testimony of all of the witnesses and saw their demeanor on the stand. Since the jury "is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *State v. Spears,* 178 Ohio App.3d 580, 2008-Ohio-5181, ¶12, quoting *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288.

{¶ 44} Fairman correctly points out that the only witness who saw him with a gun was the victim, who admittedly had a strong dislike of Fairman. Arnold knew Fairman prior to

the shooting, and he immediately recognized Fairman in the back of the van. The two men began yelling at each other, and Arnold heard Fairman ask Pruitt for a gun. Arnold then saw Fairman raise the gun in his hand and shoot him in the chest. The jury's verdict reflects that it found Arnold's testimony to be credible.

{¶ 45} The State's other witnesses did not see who fired the shot. However, their testimony does support Arnold's claim that Fairman shot him after getting a gun from Pruitt. Just minutes before the shooting, English's mother saw the gun in the front passenger seat where Pruitt had been sitting. Worsley heard Fairman asking Pruitt for a gun immediately before she heard the shot being fired. Arnold has consistently maintained that Fairman shot him, from his first interview with police at the hospital shortly after the shooting, through trial.

{¶ 46} Fairman argues that a man with a white shirt shot Arnold, while Fairman was wearing a dark shirt. The record does not support this claim. From her testimony on re-direct examination, it appears that Fairman's witness Maggie Zile may have told the police on the night of the shooting that she saw a man in a white shirt shoot Arnold, while the other man (presumably Fairman) was wearing a dark shirt, but she did not testify to this at trial.

{¶ 47} Instead, Zile explained that her focus immediately following the shooting was on keeping the children out of the front yard, not on the two unknown men or Arnold. The shooting occurred after dark, and she was standing a couple of houses away. Upon hearing the shot, Zile looked toward the van and saw English running around the side of her house. She saw two men near the van, one wearing a white shirt, and the other wearing a dark shirt. She saw the men leave the scene together after the shooting. Zile admitted that she would not have been able to recognize either of the men from her distant view of them in the dark.

More importantly, Zile testified that she did not actually see the shooting, nor did she ever see anyone actually holding the gun.

{¶ 48} Based on the record before us, we conclude that there is sufficient evidence in the record to support the conviction. Furthermore, we do not find the judgment to be against the manifest weight of the evidence. This is not the rare case where the jury clearly lost its way resulting in a manifest miscarriage of justice.

{¶ 49} Fairman's Fourth Assignment of Error is overruled.

VI

{¶ 50} Fairman's Sixth Assignment of Error is as follows:

{¶ 51} "MR. FAIRMAN'S SENTENCE WAS CONTRARY TO LAW."

{¶ 52} In his Sixth Assignment of Error, Fairman offers three arguments in support of his claim that his sentence is contrary to law.

{¶ 53} First, Fairman claims that the trial erred in ordering a "mandatory" eight-year sentence for his Felonious Assault conviction. Felonious Assault is a second-degree felony, which allows a trial court to impose a prison term of two, three, four, five, six, seven, or eight years of imprisonment. R.C. 2929.14(A)(2). Pursuant to R.C. 2929.13(D)(1), there is a presumption in favor of a prison term for defendants who are convicted of first- and second-degree felonies.

{¶ 54} Under certain circumstances, a defendant convicted of Felonious Assault will receive a mandatory prison term. For example, R.C. 2903.11(D)(1)(b) requires a mandatory sentence for offenders found guilty of feloniously assaulting a victim whom the offender knows is pregnant, if such a specification is included in the indictment pursuant to R.C.

2941.1423, and for offenders who feloniously assault a peace officer. See R.C. 2929.13(F)(4). Additionally, R.C. 2929.13(F)(6) requires a mandatory prison term for a defendant convicted of a first- or second-degree felony when he has previously been convicted of a first- or second-degree felony. In this case, the pre-sentence investigation report indicates that Fairman has no prior first- or second-degree felony convictions. Although his record is lengthy, it consists primarily of misdemeanors. His most serious prior conviction was for Robbery, which was a felony of the third degree. Thus, on the record before us, none of the statutory exceptions requiring imposition of a mandatory prison term apply to Fairman.

{¶ 55} Additionally, we note that while R.C. 2929.13(D)(1) establishes a presumption in favor of a prison term for Fairman's Felonious Assault conviction, there is no mandatory prison term statutorily required. Therefore, the trial court erred in stating both at the sentencing hearing and in its termination entry that the court was imposing a mandatory prison term for Fairman's Felonious Assault conviction.

{¶ 56} Second, Fairman maintains that his Felonious Assault and Having Weapons Under Disability convictions are allied offenses of similar import that should have been merged for sentencing pursuant to R.C. 2941.25(A). Because this issue was not raised in the trial court, Fairman has waived all but plain error. *State v. Long* (1978), 53 Ohio St.2d 91, 95-96, 372 N.E.2d 804; Crim.R. 52(B). Nevertheless, we have previously held that a trial court's failure to merge allied offenses of similar import constitutes plain error. *State v. Coffey*, Miami App. No. 2006 CA 6, 2007-Ohio-21, ¶14. See, also, *State v. Puckett* (March 27, 1998), Greene App. No. 97 CA 43. Here, the trial court failed to address the issue of merger.

{¶ 57} Revised Code 2941.25, Ohio's multiple count statute, provides:

{¶ 58} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 59} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶ 60} In *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme Court clarified the application of R.C. 2941.25 in determining whether offenses are allied offenses of similar import. In so doing, the Court overruled *State v. Rance,* 85 Ohio St.3d 632, 1999-Ohio-291, "to the extent that it calls for a comparison of statutory elements solely in the abstract under R.C. 2941.25. [Now w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." Id. at ¶ 44.

{¶ 61} The Supreme Court further clarified as follows:

{¶ 62} "Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

{¶ 63} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the

other offense with the same conduct, not whether it is possible to commit one *without* committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." *Johnson,* 2010-Ohio-6314, at ¶ 47-48 (emphasis in original), citing *State v. Blankenship* (1988), 38 Ohio St.3d 116, 119 (Whiteside, J., concurring).

{¶ 64} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act committed with a single state of mind.' " Id. at ¶ 49, quoting *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50.

{¶ 65} "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." Id. at ¶ 52 (emphasis in original).

{¶ 66} Fairman was convicted of Felonious Assault in violation of R.C. 2903.11(A)(2), which states in relevant part: "No person shall knowingly * * * cause or attempt to cause serious physical harm to another * * * by means of a deadly weapon or dangerous ordnance." He was also convicted of Having Weapons Under Disability in violation of R.C. 2923.13(A)(2), which states, "* * * no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment or has been convicted of any felony offense of violence * * *."

{¶ 67} Fairman's conviction for Having Weapons Under Disability was based upon

his possession of a gun after having previously been convicted of Robbery. His conviction for Felonious Assault was based upon his use of that same gun to inflict serious physical harm upon Arnold. Where, as here, the defendant uses the same firearm or dangerous ordnance in committing both crimes, it is certainly possible to commit the crime of Having a Weapon Under Disability with the same conduct as Felonious Assault. Under the facts of this case, Fairman's act of using a gun to commit Felonious Assault necessarily constituted his commission of Having Weapons Under Disability. Furthermore, the crimes were not committed separately or with a separate animus because the evidence shows that Fairman obtained the gun with the immediate intent of shooting Arnold; he had no separate animus in acquiring possession of the gun. Therefore, we conclude that Fairman's Felonious Assault and Having Weapons Under Disability convictions are allied offenses of similar import that should have been merged.

{¶ 68} We caution that this conclusion is based upon the specific facts elicited at Fairman's trial. However, because *Johnson* sets forth a factually based test, our conclusion here does not preclude the possibility that the facts established at a second trial might be different, which could compel a different result.

{¶ 69} Third, Fairman insists that the trial court erred in imposing consecutive sentences. Having concluded that under the particular facts of this case that Felonious Assault and Having Weapons Under Disability are allied offenses of similar import, this argument is moot.

{¶ 70} Fairman's Sixth Assignment of Error is sustained in part.

VII

{¶ 71} Fairman's Seventh Assignment of Error is as follows:

{¶ 72} "THE TRIAL COURT ERRED IN IMPOSING COSTS."

{¶ 73} In his Seventh Assignment of Error, Fairman claims that the trial court erred in ordering him to pay court costs.

{¶ 74} Generally, a trial court should assess court costs against each convicted defendant at his sentencing, and the costs must be included in the termination entry. *State v. Threatt,* 108 Ohio St.3d 277, 2006-Ohio-905, ¶ 23, citing R.C. 2947.23; *State v. White,* 103 Ohio St.3d 580, 2004-Ohio-5989, ¶ 8. However, a trial court has discretion to waive court costs assessed against an indigent defendant. *State v. White*, supra, at ¶ 14. Concluding that a termination entry is a final appealable order as to the assessment of court costs, the Court explained that "an indigent defendant must move a trial court to waive payment of costs at the time of sentencing. If the defendant makes such a motion, then the issue is preserved for appeal and will be reviewed under an abuse-of-discretion standard. Otherwise, the issue is waived and costs are res judicata." *State v. Threatt*, supra, at ¶ 23.

{¶ 75} We have recently explained, however, that there is an exception to this general rule when a trial court fails to mention court costs during the sentencing hearing. *State v. Lunsford,* 193 Ohio App.3d 195, 2011-Ohio-964, ¶ 15, citing *State v. Joseph,* 125 Ohio St.3d 76, 2010-Ohio-954, ¶ 22. While the court's failure to state upon the record at the sentencing hearing that it is imposing court costs does not make the sentence void, there has still been an error because Crim.R. 43(A) requires that a criminal defendant must be present at each stage of his trial, including sentencing. *Lunsford,* citing *Joseph,* supra, at ¶ 22. Furthermore, the error is not harmless, because the trial court's failure to impose court courts during the

sentencing hearing denies the defendant an opportunity to claim indigence and to seek a waiver of the payment of the court costs. *State v. Lunsford*, at ¶ 16. "Under such circumstances, principles of waiver and res judicata do not apply." Id., at ¶ 15.

{¶ **76**} Fairman's Seventh Assignment of Error is sustained.

### VIII

{¶ **77**} Fairman's Second Assignment of Error having been sustained, and his Fourth Assignment of Error having been overruled, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . .

FROELICH, J., concurs in judgment.

HALL, J., concurring in part and dissenting in part:

{¶ **78**} I concur with the majority's decisions to overrule the 1st, 3rd, 4th, and 5th assignments of error, and to sustain the 7th assignment of error, for the reasons that were detailed in the lead opinion. With regard to the 2nd assignment of error, I believe that the trial court did not abuse its discretion by denying a further continuance to obtain a witness whose proffered testimony would have had no impact on the trial whatsoever. I also disagree with the conclusion, concerning the 6th assignment of error, that the offenses of Felonious Assault (deadly weapon) and Having a Weapon While Under a Disability merge as allied offenses of similar import. Accordingly, I dissent from those conclusions.

{¶ **79**} Tremayne Arnold was shot in the chest on April 10, 2010. He testified that he and the defendant were having a heated argument at the side of a van in front of 851 N. Euclid Ave. The defendant was in, or at, the back passenger side of the van owned by Zenobia

English. The victim was outside the open sliding side passenger door, five or six feet from the defendant. Zenobia English and Channa Worsley were on either side of the victim trying to keep him from engaging the defendant in a fight. Davares Pruitt, who had been in the front passenger seat, was getting out, or had gotten out, of his seat. The victim testified: "* * * that's when I hear him [Fairman] talking to Davares. He said—first he asked for the gun. Davares says no the first time. * * * Then he starts begging like a little girl for the gun." T. 52 "* * * I already see them getting so close that they were going to exchange the gun." T. 53 "When I finally get them [the ladies] out of the way, * * * That's when he [Fairman] pulls the gun and shoots me." T. 54.

{¶ 80} At the hospital emergency room when they started to put a chest tube in the victim, a police officer asked him "* * * if you don't make it, do you know who did it? * * * I said I only know his street name is JT [otherwise identified as Jay T. Fairman]" T 59.

{¶ 81} Channa Worsley testified that she heard Fairman asking for the gun just before she heard the shot being fired. After the shot, Fairman ran away. T 103-104. Zenobia English, also trying to keep Tremayne from getting into a fight, heard Fairman screaming that Tremayne murdered his [Fairman's] nephew, and then heard, but did not see, a gunshot. T 166.

{¶ 82} With this background, the defense asserted, during trial, that they needed an additional continuance to find Davares Pruitt and have him testify. Although counsel for the defendant had talked with Pruitt by telephone, counsel's proffer of his prospective testimony fails to directly state what Pruit's testimony would be. The proffer only suggests what Pruitt had said to another witness, John Roan, who also was not called. Roan had apparently been

subpoenaed and was in the hallway when the prosecutor, detective and defense counsel talked to Roan. Defense counsel said Roan "* * *does not suggest that Mr. Pruitt is the shooter; however, that Mr. Pruitt, if he would testify, *according to what Mr. Roan offered*, would be that Mr. Pruitt would say that the shot came from outside the van and behind him, thereby providing some evidence that Mr. Fairman was not, in fact, the shooter." T 316. Thus, the proffer is, at best, second hand information, not about what the witness Pruitt said to police or detectives, or the prosecutor or defense counsel, but about what he told another witness who did not testify.   The proffer itself is, therefore, speculative.

{¶ 83} There were several considerations the trial court had to evaluate before granting an additional day of continuance when the trial had already been continued from the previous afternoon. Originally the jury had one alternate. (Empaneling entry filed August 18, 2010). During the second day of trial, one of the jurors had a family emergency and he was excused T. 108. Moreover, before being dismissed for the second day of trial, the court informed the jury that on the following day they may hear from one more witness and then the trial would be completed with closing arguments and the court's instructions. The risks, and inconvenience inherent in continuing the trial for another day are evident. Finally, as the court referenced, the evidence at trial was that Davares Pruitt was the owner of the weapon that Pruitt apparently gave to the defendant so that the defendant could shoot Tremayne Arnold. Under those circumstances, the court would have advised Pruitt of his right to remain silent (T. 323) and it was thus uncertain whether Pruitt would choose to testify at all. Moreover, the case of *State v. Unger* and most of its progeny deal with continuances before trial and does not address the specific considerations that the trial court must deal with during a jury trial. Given

all the factors mentioned, I cannot say that the trial court abused its discretion in denying the motion for an additional continuance for another day. I would overrule the second assignment of error.

**{¶ 84}** Felonious Assault and Having a weapon While Under a Disability are not allied offenses of similar import that merge. In *State v. Elder*, Richland Co Ct App., 2011-Ohio-4438,    the Fifth District Court of Appeals was faced with an argument virtually identical to Fairman's. "Appellant's argument is that the basis of his conviction for having weapons under disability was his use of a firearm to commit the felonious assault. He suggests the two offenses were committed simultaneously with the same animus of causing physical harm.

**{¶ 85}** "The trial court found the animus of having weapons under disability is making a conscious choice to possess a weapon. Felonious assault requires a conscious choice to attack someone using a weapon. The court found the commission of the two offenses involves separate animi, and the fact a defendant chooses to assault a victim with a firearm should not and cannot absolve the defendant of the criminal liability which arises solely from his illegal possession of a weapon.

**{¶ 86}** "We agree with the trial court that the animus for possessing a weapon under disability is different from the animus for felonious assault. We find the trial court did not err in rejecting appellant's argument his convictions for felonious assault and for weapons under disability should be merged." Elder, supra ¶ 6-8.

**{¶ 87}** In addition, I believe that the two offenses are committed by different acts. Fairman acquired the disability that prevents him from having a firearm by committing a

felony of violence long before he used a firearm to shoot Tremayne Arnold. That separate act is unrelated to the Felonious Assault. Therefore the offenses of Felonious Assault and Having a Weapoon While Under a Disability were committed by separate acts, and separate animi, and the offenses do not merge. I would overrule the Sixth assignment of error.

. . . . . . . . . . . . .

Copies mailed to:

Mathias H. Heck
R. Lynn Nothstine
Lucas W. Wilder
Hon. Mary L. Wiseman